IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

NANETTE OLSON,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

No. C14-1003

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   **PRINCIPLES OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     **A.**   *Olson's Education and Employment Background* . . . . . . . . . . . . . . 6
     **B.**   *Testimony from Administrative Hearing held on June 21, 2013* . . . . 6
         **1.**   *Olson's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
         **2.**   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . . . 6
     **C.**   *Olson's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.    **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     **A.**   *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . . 17
     **B.**   *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . . 19
         **1.**   *Treating and Examining Source Opinions* . . . . . . . . . . . . . 19
             *a.*   *Dr. Yankey's and Dr. Mulderig's Opinions* . . . . . . . . 21
             *b.*   *Healy's Opinions* . . . . . . . . . . . . . . . . . . . . . . . 23
         **2.**   *Mental Impairments* . . . . . . . . . . . . . . . . . . . . . . . . . 25
         **3.**   *Credibility Determination* . . . . . . . . . . . . . . . . . . . . . . 27
         **4.**   *RFC Assessment* . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VII.  **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Nanette Olson on February 12, 2014, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Olson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Olson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 15, 2009, Olson applied for both disability insurance benefits and SSI benefits. In her applications, Olson alleged an inability to work since March 11, 2007 due primarily to back pain. Olson's applications were denied on August 6, 2009. On November 17, 2009, her applications were denied on reconsideration. On January 25, 2010, Olson requested an administrative hearing before an Administrative Law Judge ("ALJ"). On April 6, 2011, Olson appeared via video conference with her attorney before ALJ Jeffrey Marvel for an administrative hearing. In a decision dated May 4, 2011, the ALJ denied Olson's claims. Olson appealed the ALJ's decision. On August 16, 2011, the Appeals Council denied Olson's request for review. Consequently, the ALJ's May 4, 2011 decision was adopted as the Commissioner's final decision.

On October 5, 2011, Olson filed a Complaint seeking judicial review of the Commissioner's decision to deny her applications for disability insurance benefits and SSI

---

[1] On March 24, 2014, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

benefits.[2]  On August 20, 2012, United States District Court Judge Edward J. McManus reversed and remanded Olson's case to the Commissioner for further consideration of the medical evidence and Olson's subjective allegations of disability.[3]  On June 21, 2013, Olson appeared via video conference with her attorney before ALJ Eric S. Basse for an administrative hearing "on remand from the Appeals Council pursuant to a remand from the United States District Court for the Northern District of Iowa."[4]  In a decision dated October 23, 2013, the ALJ determined that Olson was not under a disability from March 11, 2007, her disability onset date, through May 4, 2011. Olson did not appeal the ALJ's decision on remand, and the Appeals Council did not review the ALJ's decision on its own. Consequently, the ALJ's October 23, 2013 decision became the Commissioner's final decision.[5]

On February 12, 2014, Olson filed the instant action for judicial review of the ALJ's October 23, 2013 decision.

---

[2] *See* docket number 4 in case number 2:11-cv-1041-EJM (N.D. Iowa).

[3] *See* docket number 11 in case number 2:11-cv-1041-EJM.

[4] Administrative Record at 751. On May 24, 2011, prior to Judge McManus' remand order, Olson filed new applications for disability insurance benefits and SSI benefits, alleging an inability to work since May 5, 2011. On August 30, 2011, the Social Security Administration, through the State agency, determined that as of May 5, 2011, Olson was disabled under Medical-Vocational rule 202.06. The Appeals Council affirmed the State agency determination. Thus, the instant appeal and the ALJ's remand decision concerns the time period before May 5, 2011. *See* Administrative Record at 751.

[5] *See* Administrative Record at 749 (Providing in the notice of the ALJ's decision to Olson that "[i]f you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice.").

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the decision of the Administrative Law Judge ("ALJ") meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider

4

evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Olson's Education and Employment Background

Olson was born in 1956. She did not graduate from high school, but later earned a GED. She also earned a degree from nursing school. In the past, she worked primarily as a licensed practical nurse ("LPN").

### B. Testimony from Administrative Hearing held on June 21, 2013

#### 1. Olson's Testimony

At the administrative hearing, Olson was asked whether she was capable of performing typical, routine household chores, such as preparing a meal, washing dishes, or cleaning. Olson replied that she was capable of such activities to "[t]he best that I could at that time."[6] Specifically Olson testified that "[d]oing dishes, I have a stool. Doing dishes I many times had to sit on the stool to complete that task. Vacuuming, I literally sat in my computer chair to vacuum, to roll around because of the back pain."[7] According to Olson, her difficulties with physical activities are primarily due to back pain and shoulder problems. The ALJ further inquired about Olson's back problems and asked her if her back pain limited her ability to be on her feet for most of the day. Olson responded that "I can be up -- I can walk about a block before the pain in my back gets severe and I have to stop."[8] Olson also reported difficulties with memory and concentration.

#### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who is able to:

---

[6] Administrative Record at 785.

[7] *Id.*

[8] Administrative Record at 789.

perform light work[.] . . . Can frequently balance and occasionally climb, stoop, kneel, crouch, and crawl. Cannot climb ladders, ropes and scaffolds.

(Administrative Record at 797). The vocational expert testified that under such limitations, Olson could not perform her past relevant work. The vocational expert testified, however, that Olson's acquired skills would transfer to the following jobs: (1) companion, and (2) blind aide. Using the same hypothetical individual, the ALJ inquired whether such a person could perform any unskilled jobs. The vocational expert replied that such an individual could perform the unskilled jobs of mail clerk and office helper.

### C. Olson's Medical History

On January 8, 2007, Olson presented at Finley Hospital in Dubuque, Iowa, complaining of low back pain. She met with Dr. Jon R. Yankey, M.D., and reported that her low back pain started around 4:00 p.m. on January 7, while she was at work. Dr. Yankey noted that:

> [Olson] does not recall a specific incident or injury. She states that she was pushing a medication cart at the time that she first noticed the pain. . . . She states that when she first noted the pain yesterday the pain was an "aching." However, the pain progressed quickly and became severe within about two hours. She states that the pain was severe enough that she was having difficulty standing upright.

Administrative Record at 547.) Olson rated her pain at 8 on a scale of 1 to 10 with 10 being the most severe pain. Upon examination, Dr. Yankey diagnosed Olson with low back pain, probably exacerbated by degenerative disc disease of the lumbar spine. Dr. Yankey recommended "conservative treatment," consisting of medication and exercise. Dr. Yankey also recommended the following work/non-work activity restrictions:

> I advised no lifting, carrying, pushing or pulling over 10 pounds. She should limit bending, stooping and twisting.

7

> She should be allowed frequent position changes. She should
> [not do] extensive reaching. She is taking medication which
> may induce drowsiness.

(Administrative Record at 548.)

On January 16, 2007, Olson returned to Dr. Yankey for a follow-up visit. Olson reported slight improvement since her visit on January 8. She rated her pain at 5 out of 10. Dr. Yankey noted that Olson "is more comfortable than at her last visit. She goes from a sitting to standing position and onto and off the exam table much better and with just very slight stiffness now."[9] Dr. Yankey further determined that:

> [Olson's] back has improved slightly since her last visit in that
> the pain has decreased in intensity[.] . . . Her back motion has
> improved slightly. She has no true radicular symptoms. She
> has no neurological deficits although she has mild generalized
> weakness in her legs which I feel is probably not related to her
> current back pain.

(Administrative Record at 544.) Dr. Yankey recommended continued "conservative treatment," including medication and retaining her previous work/non-work activity restrictions.

On January 24, 2007, Olson, again, met with Dr. Yankey for a follow-up appointment. Olson reported that her back pain had improved "well." However, on the evening prior to her appointment, she stated that she had an incident at work that exacerbated her back pain. Specifically, she reported that while helping move a patient, her low back pain increased in intensity and seemed to radiate into her mid-back area. When she stopped, the pain became localized in her low back and decreased in intensity. She rated her pain at 4 out of 10. Dr. Yankey observed that Olson was "comfortable" and could "get up from a chair and onto and off the exam table without stiffness or apparent

---

[9] Administrative Record at 544.

pain."[10] Dr. Yankey concluded that Olson's "back appeared to have continued to improve well until an incident at work last evening. However, her back today again appears improved. I feel that she is making progress."[11] Dr. Yankey recommended continued "conservative" treatment with medication and 2 weeks of physical therapy.

On February 8, 2007, Olson returned to Dr. Yankey for a follow-up appointment. Olson reported that her back pain had "improved." She rated her pain at 3 out of 10. She stated that her "pain is intermittent and has become less frequent."[12] Olson complained, however, of weakness in both legs and arms. X-rays showed degenerative changes including hypertrophic spurring and disc space narrowing. Upon examination, Dr. Yankey diagnosed Olson with low back pain and bilateral arm and leg weakness. Dr. Yankey noted that Olson's "back pain may be slightly improved. However, she continues to report persistent, fairly symmetrical weakness in her legs and now in her arms. On exam she does appear to have mild weakness which seems to be symmetrical in her extremities."[13] Dr. Yankey continued "conservative" treatment with medication and daily exercise. Dr. Yankey also increased her work/non-work activity restrictions as follows:

> I feel that sitting work is preferred. She should limit walking, standing, climbing, and stairs. She should do no lifting, carrying, pushing, or pulling over 10 pounds. She should limit bending, stooping, and twisting. She should do no extensive reaching. She is taking medications with may induce drowsiness.

(Administrative Record at 534.)

---

[10] Administrative Record at 540.

[11] *Id.*

[12] *Id.* at 533.

[13] *Id.* at 534.

9

On February 20, 2007, Olson had another follow-up appointment with Dr. Yankey. Olson reported that her back pain was "much improved." She stated that her back pain had decreased, and rated her pain at 1 out of 10. She reported no weakness with her arms, but continued to have weakness in both legs when going up stairs. Dr. Yankey observed that Olson was "comfortable. She moves around the exam room well. She can get up from the chair and on and off the exam table without stiffness or apparent pain."[14] Upon examination and review of an MRI, Dr. Yankey diagnosed Olson with exacerbation of degenerative joint disease and degenerative disc disease of the lumbar spine. Dr. Yankey continued treating her with medication and exercise. Dr. Yankey also had Olson retain her previous work/non-work activity restrictions from February 8.

On March 7, 2007, Olson met with Dr. Yankey for a follow-up appointment. Olson reported that her "back is much improved. She reported that she is not having pain in her back any longer. She reports no pain, numbness, or tingling in her legs. She feels that her back motion has improved well and has returned to its usual status."[15] Olson also had no weakness or pain in her arms, but continued to complain of weakness in her legs. However, she stated that her leg weakness had "improved slightly." Upon examination, Dr. Yankey determined that Olson's:

> examination here is essentially unchanged and is essentially negative except for mild weakness in both legs. I feel that the exacerbation of the degenerative joint disease and degenerative disc disease of the lumbar spine has resolved. I feel that the weakness in her legs is related to the degenerative changes in the spine and not the exacerbation. I feel that [Olson] has reached maximum medical improvement related to the recent exacerbation of the degenerative changes.

---

[14] Administrative Record at 526.

[15] *Id.* at 513.

(Administrative Record at 514.) Dr. Yankey also reviewed the results of a functional capacity evaluation ("FCE") Olson underwent on March 2. According to the FCE, Olson's lifting abilities placed her in the sedentary-light physical demand level. The FCE examiner opined that:

> [Olson's] current functional abilities do not match those required by her job. She is able to tolerate non-material handling tasks, such as bending, twisting, sitting, and standing without difficulty. However, her capacity for lifting is limited. . . . [Olson's] current limitations are secondary to her lower extremity weakness. She reported only mild increases in pain during sitting activities.

(Administrative Record at 519.) Based on the FCE, Dr. Yankey placed the following restrictions on Olson:

> I recommend[] that [Olson] limit lifting to 15 pounds occasionally and 7 pounds frequently. She should also limit [] pushing and pulling to 30 pounds frequently. I recommend that these activity restrictions be permanent.

(Administrative Record at 514.) Dr. Yankey also recommended that Olson continue to exercise daily and take her medications as needed for treatment.

On December 13, 2007, Olson was referred by Disability Determination Services ("DDS") to Brenna Healy, M.A., a licensed psychologist, for a psychological evaluation. Olson stated that she had difficulty with mood swings and depressed mood. She indicated that her mood swings were the result of her son needing dialysis, her health problems, and the loss of her job. Healy noted that:

> During the evaluation, [Olson] appeared alert and oriented. There were no signs of thought disorder. She denied suicidal ideation. There were no signs of hallucinations, delusions, or mania. Stream of talk was normal and there was no apparent loosening of associations. Insight and judgment appeared fair. She was pleasant and cooperative with good eye contact.

11

(Administrative Record at 437.)  Healy diagnosed Olson with depressive disorder in remission.  Healy concluded that Olson "appears to have moderate impairments in mental functioning related to her ability to work."[16]

On January 4, 2008, Dr. Myrna Tashner, Ed.D., reviewed Olson's medical records and provided DDS with a Psychiatric Review Technique assessment for Olson. Dr. Tashner diagnosed Olson with depression in remission.  Dr. Tashner determined that Olson had the following limitations:  no restriction of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  Dr. Tashner concluded that:

> Preponderance of [the medical evidence of record] supported a non severe [medically determinable impairment].  The allegations were credible to the extent supported by [the medical evidence of record] which was softened by no ongoing [mental health treatment] by [a] specialist.

(Administrative Record at 452.)

On January 23, 2008, Olson was referred by DDS to Dr. Peggy Mulderig, M.D., for a consultative disability evaluation.  Dr. Mulderig noted that Olson's chief complaints were low back pain, neck pain, and numbness and tingling at the left neck and right hand. Olson reported that "her pain is worse with bending forward but also with standing for long periods of time.  She has no weakness into her lower extremities. . . .  She occasionally has pain into her legs."[17]  Dr. Mulderig also noted that Olson claimed pain every day, which increases with activity.  Dr. Mulderig's examination notes describe Olson's typical day as follows:

---

[16] Administrative Record at 438.

[17] *Id.* at 455.

> She gets her [activities of daily living] done. She helps her
> son get ready to go to dialysis. She would do the dishes and
> then lay back down. She putters around her trailer. She states
> she is unable to shovel snow or vacuum.

(Administrative Record at 456.) Upon examination and review of Olson's medical records, Dr. Mulderig diagnosed Olson with chronic back pain, chronic neck pain, history of hyperthyroidism with related heart disease, history of non-insulin dependent diabetes, GERD, and hypertension. In conclusion, Dr. Mulderig opined that:

> [Olson] has a weight limit imposed previously by her
> physician. This could be verified by a functional capacity
> evaluation. Standing, walking, and moving about did not look
> to be limited for an 8 hour day. Stooping, climbing, kneeling
> and crawling should be limited to an occasional basis.
> [Olson's] ability to handle objects, see, hear, speak and travel
> do not look to be limited. At the work environment no
> limitations with dust, fumes or extremes of temperature or
> hazards.

(Administrative Record at 456.)

On March 4, 2008, Dr. Dennis Weis, M.D., reviewed Olson's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Olson. Dr. Weis determined that Olson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Weis also determined that Olson could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Weis found no manipulative, visual, communicative, or environmental limitations. Dr. Weis concluded that:

> [Olson's] allegations are to an extent consistent with evidence
> contained in the file. Credibility is eroded to a degree,
> however, due to the fact there is little evidence of impairment

13

> in any of her conditions alleged, other than her back issues,
> [and] this is largely stable with currently essentially normal
> exam with exception of mild decreased [range of motion]. All
> evidence considered, [Olson] would be capable of RFC as
> outlined.

(Administrative Record at 468.)

On July 28, 2009, Dr. Laura Griffith, D.O., reviewed Olson's medical records and provided DDS with a physical RFC assessment for Olson. Dr. Griffith determined that Olson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Griffith also determined that Olson could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found no manipulative, visual, communicative, or environmental limitations.

On July 8, 2011, Dr. Donald Shumate, D.O., reviewed Olson's medical records and provided DDS with a physical RFC assessment for Olson. Dr. Shumate determined that Olson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Shumate also determined that Olson could frequently balance, but only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. Dr. Shumate found no manipulative, visual, communicative, or environmental limitations. In his assessment, Dr. Shumate noted that:

> [Olson's] alleged limitations for lifting and walking are not
> well supported by the objective findings. Although she has
> chronic lumbar pain there is no evidence o[f] any
> radiculopathy or neurological impairment and multiple visits

> document normal gait and strength in [her lower extremities].
> Neuropathy is described as mild and on exam monofilament
> testing was normal.

(Administrative Record at 1019.) Dr. Shumate further noted that Olson's "[c]urrent [activities of daily living] indicate no problems with personal cares. She prepares full meals, vacuums, sweeps and mops, does laundry, drive[s], and shops."[18] Dr. Shumate concluded that "[t]he preponderance of evidence supports that [Olson] is capable of activity as noted in the RFC."[19]

On August 1, 2011, Olson was referred by DDS to Dr. Jane A. Springer, Ph.D., for a psychological evaluation. In reviewing Olson's mental health history, Dr. Springer noted that:

> Other concerns include ongoing problems with depression and
> anxiety for years. [Olson] stated that she was treated with
> Prozac for the past ten years as prescribed by her family
> physician. She started taking Prozac due to menopausal
> symptoms as she was experiencing significant mood swings
> and anger management problems. She stated she used to kick
> the doors and walls in rages, though she denied causing harm
> to others. She indicated that she still is easily aggravated,
> angry, and easily upset over unexpected problems or changes.
> She is no longer aggressive but rather tends to yell at others.
> She indicated that she is socially isolated except for some
> social interactions during religious meetings twice per
> week. . . . Current depressive symptoms included sad mood,
> feeling discouraged, loss of pleasure and interest, guilty
> feelings, self-dislike, self-criticalness, diminished self-
> confidence, crying spells, indecisiveness, worthlessness, loss
> of energy, fatigue, changes in sleep and appetite, increased
> irritability, restlessness, and poor concentration. Anxiety

---

[18] Administrative Record at 1021.

[19] Id.

> symptoms acknowledged including difficulties relaxing, racing
> heart, feeling nervous and fearful, feeling shaky and unsteady,
> and being easily overwhelmed with a sense of panic.

(Administrative Record at 1024.) Upon examination, Dr. Springer diagnosed Olson with depressive disorder. Dr. Springer opined that Olson has the following functional impairments: (1) moderate limitation in the ability to remember and understand instructions, procedures, and locations; (2) moderate limitation in the ability to carry out instructions, maintain attention, concentration, and pace; (3) mild limitation in the ability to interact appropriately with supervisors, co-workers, and the public; and (4) moderate limitation in the ability to use good judgment and respond appropriately to changes in the work place.

On August 24, 2011, Dr. Russell Lark, Ph.D., reviewed Olson's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Olson. On the Psychiatric Review Technique assessment, Dr. Lark diagnosed Olson with depression. Dr. Lark determined that Olson had the following limitations: no restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Lark found that Olson was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. Dr. Lark concluded that:

> [Activities of daily living] indicate that [Olson] can handle
> daily responsibilities and is not significantly limited socially.
> Her memory, attention, concentration, and pace may vary but
> are adequate for tasks not requiring sustained attention. The
> preponderance of evidence in file indicates [Olson] is able to

complete simple, repetitive to moderately complex tasks on a
sustained basis.

(Administrative Record at 1029.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Olson was not disabled during the time period of March
11, 2007 through May 5, 2011. In making this determination, the ALJ was required to
complete the five-step sequential test provided in the social security regulations. *See* 20
C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42
(1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344
F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the
> claimant has a severe impairment, (3) whether the impairment
> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the
> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at
590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet
the criteria at any step in the evaluation of disability, the process ends and the claimant is
determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006)
(citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to
show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v.
Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812,
815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to
the Commissioner to demonstrate that the claimant retains the residual functional capacity

("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Olson had not engaged in substantial gainful activity since March 11, 2007. At the second step, the ALJ concluded from the medical evidence that Olson had the following severe impairments: degenerative disc disease, peripheral neuropathy secondary to diabetes, and obesity. At the third step, the ALJ found that Olson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Olson's RFC prior to May 5, 2011, as follows:

> [Olson] has the residual functional capacity to perform light work . . . involving lifting 20 pounds occasionally and 10 pounds frequently; standing and walking a total of 6 hours in an 8-hour workday; sitting a total of 6 hours in an 8-hour workday; only occasional balancing, stooping, crouching, kneeling, crawling and climbing; no climbing ladders, ropes, or scaffolds; and limited use of foot controls as set out for the lifting and carrying limitations.

(Administrative Record at 755.) Also at the fourth step, the ALJ determined that Olson could not perform her past relevant work. At the fifth step, the ALJ determined that prior to May 5, 2011, and based on her age, education, previous work experience, and RFC, Olson could work at jobs that existed in significant numbers in the national economy.

Therefore, the ALJ concluded that Olson was not disabled for the time period of March 11, 2007 through May 5, 2011.

### B. Objections Raised By Claimant

Olson argues that the ALJ erred in four respects. First, Olson argues that the ALJ failed to properly evaluate the opinions of her treating and examining sources. Specifically, Olson argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Yankey. Similarly, Olson argues that the ALJ failed to properly evaluate the opinions of examining sources, Dr. Mulderig and Brenna Healy. Second, Olson argues that the ALJ failed to properly evaluate her mental impairments at step 2 of the 5-step sequential evaluation. Third, Olson argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Lastly, Olson argues that the ALJ's RFC assessment is flawed because it is not supported by substantial evidence.

### 1.     Treating and Examining Source Opinions

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id.*.); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir.

2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability,

(4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

### a. Dr. Yankey's and Dr. Mulderig's Opinions

Olson argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Yankey. Specifically, Olson argues that the ALJ's reasons for discounting Dr. Yankey's opinions are not supported by substantial evidence in the record. Olson further asserts that because Dr. Mulderig agreed with Dr. Yankey's opinions, the ALJ also failed to properly evaluate Dr. Mulderig's opinions. Olson concludes that this matter should be remanded for further consideration of Dr. Yankey's and Dr. Mulderig's opinions.

In his decision, the ALJ thoroughly addressed Dr. Yankey's history of treating Olson.[20] The ALJ also addressed Dr. Yankey's assessment of Olson's functional abilities, and weighed Dr. Yankey's opinions as follows:

> Dr. Yankey recommended [Olson] limit lifting to 15 pounds occasionally and 7 pounds frequently on a permanent basis, as he classified it as "sedentary to light" work. Further he opined that [Olson] could sit and stand "frequently" but also noted that [Olson] walked and moved about without difficulty. If [Olson] had no difficulty with movement, it is inconsistent to find an associated limitation. The undersigned notes that Dr. Yankey's opinion is not consistent with the other physicians' opinions on the record, as a whole. As will be discussed below, objective medical findings, obtained by an

---

[20] *See* Administrative Record at 756-757.

unbiased consultative examiner, indicate that [Olson] was not as limited as Dr. Yankey opined. Similarly, the restrictions he placed upon [Olson] are not supported by the medical evidence as a whole. In fact, many of Dr. Yankey's lifting/carrying tests appear to have been terminated and not completed by [Olson] herself. As such, the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Olson], and seemed to uncritically accept as true most, if not all, of what [she] reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of [Olson's] subjective complaints.

(Administrative Record at 756-757.) The ALJ also addressed Dr. Mulderig's opinions and discussed her opinions in relation to Dr. Yankey's opinions:

At the request of Disability Determination Services, [Olson] was evaluated by Peggy Mulderig, M.D., in January 2008. [Olson] reported chronic low back pain, neck pain, and numbness and tingling of the left hand. She reported no weakness in her lower extremities. Unlike with her testing with Dr. Yankey, discussed above, [Olson] did not self-limit at this examination. As such, Dr. Mulderig was able to get a more clear picture of [Olson's] abilities and limitations. Physical examination revealed . . . full 5/5 strength in all extremities; full range of motion in all her cervical spine; intact sensation; and ability to heel and toe walk. Dr. Mulderig noted [Olson] had a weight limit as imposed by her physician, which required further verification through Functional Capacities Evaluation. It was further opined that [Olson's] standing, walking, and moving about did not appear to be limited for an 8-hour day. She opined stooping, climbing, and crawling should be limited to an occasional basis. There is nothing in Dr. Mulderig's essentially normal examination with fully intact strength and normal walking, that would suggest [Olson] was limited to sedentary type work.

(Administrative Record at 757-758.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Yankey. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Yankey's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Similarly, the Court finds that the ALJ properly evaluated Dr. Mulderig's opinions. Specifically, the Court finds that the ALJ accurately contrasted Dr. Mulderig's opinions with the opinions of Dr. Yankey. For example, Dr. Mulderig noted Dr. Yankey's lifting restrictions, but did not adopt his restrictions.[21] The ALJ also accurately found that "[t]here is nothing in Dr. Mulderig's essentially normal examination with fully intact strength and normal walking, that would suggest [Olson] was limited to sedentary type work."[22] Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### b. *Healy's Opinions*

Olson argues that the ALJ failed to properly evaluate the opinions of an examining licensed psychologist, Brenna Healy, M.A. Specifically, Olson argues that the ALJ's reasons for discounting Healy's opinions are not supported by substantial evidence on the record. Olson concludes that this matter should be reversed and remanded to allow the ALJ to properly evaluate Healy's opinions.

The ALJ addressed Healy's opinions as follows:

> The undersigned considered the opinion of the licensed psychologist, [] Healy, who performed a consultative examination in December 2007. Little weight is accorded to

---

[21] Dr. Mulderig suggested that at a minimum, further testing was required to corroborate Dr. Yankey's lifting limitations.

[22] Administrative Record at 758.

the opinion that [Olson] appeared to have "moderate impairments in mental functioning related to her ability to work" because the opinion was inconsistent with the record as a whole, not consistent with mental status examination, and inconsistent with the reported activities of daily living. For example, [] Healy diagnosed [Olson's] Depressive Disorder as being in remission; implicating that the Depression was not currently present. Moreover, Mental Status Examination indicated that [Olson] was "alert and oriented. There were no signs of thought disorder. She denied suicidal ideation. There were no signs of hallucinations, delusions, or mania. Stream of talk was normal and there was no apparent loosening of associations. Insight and judgment appeared fair. She was pleasant and cooperative with good eye contact." In fact, [] Healy specifically opined that [Olson's] "physical impairments appear to be more significant than her mental impairments in limiting her ability to work." Treatment notes also support "mild" findings in daily functioning, concentration, persistence, and pace, and social functioning. For instance, mental status examination obtained in March 2010, as well as multiple other dates, indicated that [Olson] was oriented to time, place, and self, with speech and language that were normal.

(Administrative Record at 760.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Healy. The Court also finds that the ALJ provided "good reasons" for rejecting Healy's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. *Mental Impairments*

Olson argues that the ALJ erred in his assessment at step 2 of the sequential analysis by failing to find her depression to be a severe mental impairment. Olson maintains that her history of mental health treatment supports a finding that her depression constitutes a severe mental impairment. Olson concludes that the ALJ's failure to consider her depressive disorder as a severe impairment at step 2 of the sequential analysis warrants reversal.

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citations omitted). In other words, if the impairment would only have a minimal effect on a claimant's ability to work, then it would not constitute a severe impairment. *Id.* (citation omitted). The Eighth Circuit Court of Appeals has stated "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that claimant failed to make this showing." *Id.* at 708 (citations omitted).

In his decision, the ALJ thoroughly explained his reasoning for determining that Olson's depressive disorder is not a severe impairment. The ALJ explained that:

> [Olson's] medically determinable impairments of . . . depression do not cause more than minimal limitation in [her] ability to perform basic mental work activities. . . . [Olson] was diagnosed with depressive disorder, not otherwise specified, in remission, in December 2007. Although psychotropic medication had been prescribed in the past, [Olson] reported she did not utilize medication for depression. Consequently, the undersigned finds these impairments to be nonsevere in nature.

(Administrative Record at 754.) Furthermore, as discussed in section *V.B.1.b*, the ALJ properly evaluated the opinions of Brenna Healy, a consultative examining licensed psychologist. With regard to Healy's opinions, the ALJ determined:

> Little weight is accorded to the opinion that [Olson] appeared to have "moderate impairments in mental functioning related to her ability to work" because the opinion was inconsistent with the record as a whole, not consistent with mental status examination, and inconsistent with the reported activities of daily living. For example, [] Healy diagnosed [Olson's] Depressive Disorder as being in remission; implicating that the Depression was not currently present. Moreover, Mental Status Examination indicated that [Olson] was "alert and oriented. There were no signs of thought disorder. She denied suicidal ideation. There were no signs of hallucinations, delusions, or mania. Stream of talk was normal and there was no apparent loosening of associations. Insight and judgment appeared fair. She was pleasant and cooperative with good eye contact." In fact, [] Healy specifically opined that [Olson's] "physical impairments appear to be more significant than her mental impairments in limiting her ability to work." Treatment notes also support "mild" findings in daily functioning, concentration, persistence, and pace, and social functioning. For instance, mental status examination obtained in March 2010, as well as multiple other dates, indicated that [Olson] was oriented to time, place, and self, with speech and language that were normal.

(Administrative Record at 760.)

Having reviewed the entire record, the Court finds that the ALJ thoroughly considered and properly addressed Olson's mental health history and treatment for mental health problems. Accordingly, the Court finds that the ALJ's determination at step 2 of the sequential test, that Olson's depressive disorder is not a severe impairment, is

supported by substantial evidence. *See Anderson*, 696 F.3d at 793. Therefore, the Court concludes that Olson's argument on this issue is without merit.

### 3. Credibility Determination

Olson argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Olson maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Olson's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies

in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

The ALJ addressed Olson's credibility as follows:

> After careful consideration of the evidence, the undersigned finds that [Olson's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Olson's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible. The record reflects [Olson] made inconsistent statements regarding matters relevant to the issue of disability. At one point or another in the record, either in forms completed in connection with the application, in medical records, or in testimony, [Olson] reported caring for personal

needs, making sure her son was picked up by a bus three times a week for dialysis, performing light household chores, shopping once or twice a week, walking approximately two blocks, watching television, reading, and hosting bible study in her trailer once a week. [Olson] maintained contact with extended family. Further, [she] has no significant problems with personal care, was capable of preparing meals, and performing house and yard work. Further, [she] was able to get around town on her own, and handle shopping responsibilities and financial matters, as such needs may arise. The activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. There is evidence that [Olson] was not compliant in taking prescribed medications, suggesting symptoms may not have been as limiting as alleged.

Evidence did not show [Olson] did not have access to free or low cost medical services in accordance with the guidelines in Social Security Ruling 96-7p. The record includes evidence strongly suggesting exaggerated symptoms and limitations and the [Olson] admitted to certain abilities which provide support for part of the residual functional capacity conclusion in this decision. For these reasons, the undersigned finds [Olson] has been less than credible regarding her allegation of total disability.

(Administrative Record at 759.)

It is clear from the ALJ's decision that he thoroughly considered and discussed Olson's treatment history, medical history, functional restrictions, effectiveness of medications, and activities of daily living in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Olson's subjective allegations of pain and disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective

29

complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Olson's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 4. RFC Assessment

Olson argues that the ALJ's RFC assessment is flawed. Specifically, Olson argues that the ALJ's RFC assessment is not supported by substantial evidence in the record. Olson maintains that this matter should be remanded for further consideration of her RFC.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Having reviewed the entire record, the Court finds that the ALJ properly considered Olson's medical records, observations of treating physicians, and Olson's own description of her limitations in making the ALJ's RFC assessment for Olson.[23] *See Lacroix*, 465 F.3d at 887. Moreover, as discussed in sections *V.B.1.a* and *b* of this ruling, the Court found that the ALJ properly considered the opinions of Olson's treating and examining sources in making his overall disability determination, including determining her RFC. Similarly, in section *V.B.2*, and contrary to Olson's assertions, the ALJ properly determined that her depressive disorder did not constitute a severe impairment. Lastly, in section *V.B.3*, the Court found that the ALJ made a proper credibility determination for Olson. Thus, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ fully considered Olson's subjective allegations and the medical evidence as a whole, the Court concludes that the

---

[23] Administrative Record at 754-760 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Olson's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Olson's treating and examining sources. The Court also finds that the ALJ's determination at step 2 of the sequential test is supported by substantial evidence. Additionally, the Court finds that the ALJ properly determined Olson's credibility with regard to her subjective complaints of pain and disability. Finally, the Court determines that the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. Accordingly, the Court concludes that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

1.    The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.    Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this 22nd day of December, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA